JESSIE TIPTON, *Appellee,* v. THE TOPEKA RAILWAY COMPANY, *Appellant.*

No. 18,104.

SYLLABUS BY THE COURT.

1. NEGLIGENCE—*Places to Receive and Discharge Passengers Must be Reasonably Safe.* Where a street railway company maintains a stopping place for its cars to receive and discharge passengers at a point which is not in a public street, but is upon public grounds opening into a public street, it owes a duty to the public to keep the place in a reasonably safe condition for passengers unfamiliar with the surroundings who come there in the nighttime to board its cars.

2. ———— *Passenger's Right to Assume Place to be Reasonably Safe.* An intending passenger who approaches in the nighttime a stopping place established near a public street by a street railway company to receive and discharge its passengers, and who is unfamiliar with the surroundings, has a right to assume that the tracks of the company over which he must cross in order to reach the car are not in a dangerous condition; and if, without negligence on his part, he is injured by reason of the defective condition of the tracks, the company will be liable.

3. EVIDENCE—*Subsequent Repairs and Alterations—Competent.* Evidence of subsequent repairs and alterations is competent for the purpose of showing defendant's control over the place where the injury was received.

Appeal from Shawnee district court, division No. 2. Opinion filed April 12, 1913. Affirmed.

*L. S. Ferry, 'T. F. Doran,* and *J. S. Dean,* all of Topeka, for the appellant.

*James A. Troutman,* of Topeka, for the appellee.

The opinion of the court was delivered by .

PORTER, J.: Plaintiff was injured by falling upon the tracks of defendant's railway while attempting to cross over them in order to board an approaching car. She recovered a judgment for $2175.20, from which the defendant appeals.

The accident occurred about eleven o'clock on the night of January 26, 1910, in the city of Topeka, at a point near where Fifteenth street ends on the west side of Central park. The plaintiff claims that at that time the rails and ties of defendant's railway at this place were not filled in, but stood above the level of the surface, and that in her haste to cross the tracks in time to reach the car she stumbled and fell and was injured. There were other grounds of negligence alleged in the petition, which are relied upon and which have been argued in the briefs, including the stopping of a north bound car on the south side of Fifteenth street instead of at the north side, as required, it is claimed, by a city ordinance, failing to have a sufficient headlight on the car, and running the car at an excessive speed when approaching a street crossing; but it is difficult to discover in what respect the operation of the car had anything to do with the happening of the accident.

The defendant's main contention is that its tracks at the place where plaintiff fell are not within a public

street, and that therefore it owed no duty to the public or to the plaintiff to keep them in a passable or safe condition. In our view of the case, the only substantial controversy is whether or not the duty devolved upon the defendant to keep its tracks at the place in question in a safe condition for the use of its passengers.

From the accompanying plat it appears that the double tracks of defendant's railway from Thirteenth to Sixteenth street run north and south between the paved portion of Clay street and the enclosed portion of Central park. Clay street is sixty feet wide, but only thirty feet of it is paved. The curbing on the east side of the pavement extends in an unbroken line from Thirteenth street to Sixteenth street, for the reason that Fourteenth and Fifteenth streets, which formerly extended through the park, have been vacated from Clay street east. For a distance, therefore, of three blocks the east track of defendant's railway is not in a public street but is maintained upon a strip of ground which is a part of Central park, but which lies west of the park fence. The east side of Clay street extends to a point midway between the east and west tracks of the railway; and it follows, therefore, that Fifteenth street may be said to be open as far east as this point. The defendant's south bound cars use the west track, the north bound cars use the east track. It had been defendant's custom to stop its north and south bound cars to receive and discharge passengers at the same place, which is near a gate leading into Central park at a point where the south line of Fifteenth street intersects the park grounds. As the plat shows, there were crossings over Clay street on the north and south sides of Fifteenth street and iron plates at the east end of both crossings leading over the curbing. There was a brick walk, which had been constructed by the city, leading from the south one of these two crossings to the

west track of the railway, and a cinder walk maintained by the defendant over both tracks to the place where its cars stopped for passengers. There was, however, no brick walk at the east end of the north crossing and no cinder walk or any filling between the tracks opposite that crossing.

There is no dispute about the condition of the tracks; and the findings are that plaintiff's injuries were caused in the manner she claims. Shortly after the accident the company filled in the space between the rails, and has since kept them level with the surface.

At the time of the accident plaintiff had just left the house of Mr. Darlow, at the northwest corner of Fifteenth and Clay, almost opposite from where the cars stopped, and had crossed the paved part of Clay street, when, seeing the car approaching from the south, she took a diagonal course across both tracks, walking hurriedly in order to cross over ahead of the car. Mr. Darlow, who was familiar with the surroundings and knew where the car would stop, started from the house a little in advance of the plaintiff and crossed the tracks diagonally. When plaintiff reached the east side of Clay, Mr. Darlow noticed that she and a lady who was with her were not following him, and he called to them: "Girls, come over here. You will have to hurry." They then hurried across and the plaintiff stumbled and fell.

The jury made a number of findings, among which are: that the tracks where the accident occurred were not maintained in a safe condition; that the defective condition had existed for nine years; that if the tracks had been graded and filled in the accident would not have happened; that there were iron plates over the gutters on both sides of Clay street at the north side of Fifteenth street, indicating the usual course of travel; that plaintiff was not aware of the defective condition of the tracks before attempting to cross them; that there was no street lamp at the intersec-

tion of Clay and Fifteenth streets; that the headlight of the car did not furnish sufficient light to show the condition of the tracks; that it was dim moonlight when the accident occurred.

The jury found also that there were no signs or notices to indicate where the cars stopped at Fifteenth and Clay, and that plaintiff was not aware of the custom of the defendant to stop its north bound cars at the south line of Fifteenth street.

The defendant insists that because there was no sidewalk east of the curbing of Clay street at the north line of Fifteenth the proper course of travel for the plaintiff was to go south over Fifteenth street at the west side of Clay, then to proceed east across Clay to the brick sidewalk and cinder path over the tracks; and that it was negligence for her to attempt to cross where she did. The jury found that the crossing on the north line of Fifteenth leading east over Clay street with the iron plate across the curbing there, was an invitation to plaintiff to take the course she did, and we think the finding is supported by the evidence and the circumstances of the case. Whether she expected the car to stop directly opposite the point from which she started, or not, it was but natural for her to cross Clay street at the north line. There was a crossing there leading east, and that was the direction in which she had the furthest to go. Moreover, there was evidence that she relied upon the usual custom of cars stopping at the far side of street crossings.

From the character of the authorities cited in the briefs of both sides, as well as from the peculiar facts involved, this would seem to be a case of first impression. The appellant has cited cases in support of the contention that plaintiff's failure to look and listen was negligence which defeats recovery. The appellee has cited authorities to the point that the rights of a traveler and the railway company at a public street crossing are equal. Both sides have also argued the question

Tipton v. Street Railway Co.

whether the car was running at too great a speed; but none of the authorities cited in either brief throws much light upon the question of the duty of the defendant to keep its tracks in a safe condition at the place where the accident occurred. We are unable to discover in the facts anything to bring the case within the principles that govern a crossing case, nor is it at all clear that either the speed of the car or the fact whether it was in proper control of the motorman just before the accident affects the question of defendant's liability. By their general verdict the jury absolved the plaintiff of contributory negligence.

The fact that the railway was not maintained at this place within a public street does not, as defendant contends, relieve it wholly from all liability. The tracks were on public grounds in close proximity to a public street. The gate leading into Central park was doubtless placed where it was, not because the defendant's cars stopped there, but because Fifteenth street started west from within a few feet of the place. The gate was the Fifteenth street entrance to the park, and the defendant obviously stopped its cars there for the same reason, that is, because Fifteenth street led to and from that place.

In the case of steam railways the rule is that a carrier must provide safe means of access to and egress from its stations for the use of passengers, and passengers have a right to assume that the means of access provided are reasonably safe. (*Del., L. & W. R. R. Co. v. Trautwein,* 52 N. J. Law, 169, 19 Atl. 178; *Beard v. Conn. and Pass. Rivers R. R. Co.,* 48 Vt. 101.)

In the case last cited there was a stairway for passengers through a depot building and also a stairway at each end of the passenger platform. One of the latter was open at the top and there was nothing to indicate that it was not for the use of passengers. It had, as a matter of fact, been erected by an express company by which it was exclusively used. A passenger attempting

to use it in the dark fell and was injured. The railway company was held liable because of the likelihood that a stranger would regard the stairway as designed to provide a safe way of reaching the street, and because it was the defendant's duty to close the stairway or take other measures to prevent its use by passengers. Ordinarily it is the duty of the carrier to look after the safety of the place at which passengers are invited to get on or off the train. (6 Cyc. 607, and cases cited.)

In the case of *Skottowe v. O. S. L. etc. Ry. Co.,* 22 Ore. 430, 30 Pac. 222, 16 L. R. A. 593, it was held that the fact that an approach to a steamboat landing is maintained in a public street will not relieve the carrier from liability for defects in such approach.

Manifestly, however, it would be unreasonable to apply the same rule to a street railway and to require it to provide safe means of access to its cars at every stopping place. It is obliged, usually, to stop its cars at all street crossings; and unless some provision of its franchise or an ordinance of the city requires it to pave the street between its tracks, or to maintain platforms and approaches to its cars, it is not to be held responsible for the condition of public streets, and ordinarily will not be liable for injuries to passengers caused by defects therein. The Alabama court has held in the case of a street railway that:

"A passenger is not charged with knowledge of whether a place at which the car stops, to permit passengers to alight, is reasonably safe, and is not guilty of negligence in alighting at such place, unless it is obviously dangerous, while the duty to know that the place is reasonably safe is upon the servants of the street car company." (*Mobile Light & R. R. Co. v. Walsh, C.,* 146 Ala. 295, syl. ¶ 6, 40 South. 560.)

The same court, in *Montgomery Street Railway Co. v. Mason,* 133 Ala. 508, 32 South. 261, declared the law to be:

"Street railway companies are under a duty of exercising the highest degree of diligence and care to con-

serve the safety of their passengers, and this duty extends to and includes the safe landing of passengers at the termination of their journey or ride; and for failure to stop one of its cars at a place safe for a passenger to alight, or in stopping its car at a dangerous place, a street railway company is liable for damages sustained by a passenger by reason of such failure or by reason of a passenger alighting at such dangerous place." (Syl. ¶ 9.)

Ordinarily the same obligation rests upon the company with respect to the safety of the place where its cars stop to take on passengers. The Iowa court, in *McGovern v. Railway Co.*, 136 Iowa, 13, 111 N. W. 412, has held that an interurban company owes a public duty to its passengers to furnish a safe place to alight from its cars, and that a passenger has a right to assume that a car which is stopped at a highway where he is invited to alight will be stopped in a portion of the highway which is not dangerous, unless the passenger is warned of the danger. In that case the passenger was aware that the car was stopped at a place which was not a regular stopping place or station. In section 280 of the second edition of Nellis on Street Railways the author says:

"Where a street railway company has adopted a platform and invited the public to use it in getting on and off the cars, it is its duty to keep the platform in a reasonably safe condition for that purpose, and it is immaterial whether or not the platform was built by the company, or is in a public street. So, while a street railway company may not be obliged to furnish a passenger a safe place to alight from its cars, where they are stopped not at a regular stopping place at his instance, yet, if it has provided any portion of its roadbed as a place for passengers to alight, it must exercise reasonable care to keep that particular place safe for the purpose."

In *Dixon v. Brooklyn City & N. R. Co.*, 100 N. Y. 170, 3 N. E. 65, a street car company was held liable for damages to an intending passenger who was in-

jured by falling over an accumulation of snow alongside its tracks, allowed to remain there by the company to the danger of those who attempted to board its cars. In the case of *Senf v. Railroad,* 112 Mo. App. 74, 86 S. W. 887, the court in the opinion used this language:

"While the street is in no sense a passenger station for which street railroad companies are responsible (Booth on Street Railroads, sec. 326; *Bigelow v. West End Street Railway,* 161 Mass. 393; *Conway v. Horse Railroad Co.,* 90 Maine, 199), yet they are bound to avoid stopping their cars for the purpose of discharging passengers at street crossings where the condition of the street is such as to make it dangerous for a passenger to undertake to get off." (p. 85.)

In *Richmond City Railway Co. v. Scott,* 86 Va. 902, 11 S. E. 404, a street car stopped in the nighttime with its rear platform on the side of a trench several feet in depth. A passenger stepped from the platform into the trench, and the company was held liable on the ground that it ought not to have stopped its car without warning the plaintiff to leave by the other side. In *Tilden v. The Rhode Island Company,* 27 R. I. 482, 63 Atl. 675, it was held to be the duty of a street car company to provide a safe place for its passengers to alight. The rule in respect to the duties and obligations of street railways was stated by the Georgia court as follows:

"Companies engaged in carrying passengers on cars along a public street are not understood as engaging to make safe landing places, but to select them." (*Augusta Railway Co. v. Glover,* 92 Ga. 132, 146, 18 S. E. 406.)

The decisions of other courts and statements of text-writers have been quoted, not upon the theory that they are directly in point. They declare the general rules respecting the duty which a street car company owes to the public to provide reasonably safe places for its passengers to get on and off its cars, or to stop its

cars to receive and discharge passengers at places in the public streets or elsewhere which are not dangerous. The difficulty of finding cases involving a situation more nearly similar to that presented by the case at bar leads us to regard this as peculiar in itself. The place where the plaintiff met with the injuries was not a public street. The defendant had provided a place at which to stop its cars which appears to have been reasonably safe for passengers in the daytime, and which might have been safe enough in the nighttime to passengers familiar with the surroundings. But we think something more was required of the defendant. It must be held to have known that persons unfamiliar with the surroundings would be likely to approach the place in the nighttime from either side of Fifteenth street, invited to do so by the presence of street crossings and iron plates on both sides of that street; and that unless its tracks were kept leveled up even with the surface of the ground at the place where its cars stopped, passengers coming to or going from its cars in the nighttime would be in danger of receiving injuries.

Conceding, therefore, that the place was not in a public street, as defendant contends, it would seem to follow that defendant was not obliged to stop its cars at all at that point; and that it selected that as a stopping place for its own benefit. Having done this and invited the public to come there for the purpose of becoming passengers, can it relieve itself from liability for the dangerous condition of its tracks by constructing a narrow walk of cinders over them at one side only of a street leading to the place, and by filling its tracks so as to permit passengers to get on and off at one end of its cars?

Irrespective of any requirements imposed by ordinances of the city in regard to the manner in which the defendant's cars should be operated or its tracks maintained, it was, in our opinion, a duty which de-

fendant owed to the public to keep its tracks at this place in such condition that persons approaching in the nighttime from either side of Fifteenth street for the purpose of reaching its cars could do so without danger. The plaintiff doubtless had never seen or examined the blue prints and diagrams offered in evidence showing the precise situation as to street lines; she knew nothing about the latter, or of the condition of the tracks. She was in haste, but, as the jury by their general verdict have found, she was not negligent. The iron plate over the curbing at the east side of the paving in Clay street was an invitation to a person unfamiliar with the surroundings and approaching the place in the darkness—at least, to cross the curbing; and when the plaintiff had gone that far we think she had a right to assume that, as the defendant's car was to be stopped so near where she was, the tracks over which she must travel to reach it would not be left in a dangerous condition. This was one view of the case taken by the learned trial judge and it appears to us to be sound and reasonable.

Evidence of additional precautions and subsequent repairs was competent for the purpose of showing that the place where the injury was received was under the control of the defendant. (*Skottowe v. O. S. L. etc. Ry. Co.*, 22 Ore. 430, 30 Pac. 222, 16 L. R. A. 593; see, also, *Howard v. Osage City*, ante, p. 205, 132 Pac. 187.)

The judgment is affirmed.